1  **MARK BRNOVICH**
2  **ATTORNEY GENERAL**
   (Firm State Bar No. 14000)
3  **MITCHELL ALLEE** (Bar No. 031815)
   **VALERIE LOVE MARCIANO** (No. 009187)
4  **ASSISTANT ATTORNEYS GENERAL**
5  **OFFICE OF THE ATTORNEY GENERAL**
   1275 WEST WASHINGTON STREET
6  PHOENIX, AZ 85007-2926
   Telephone: (602) 542-7710
7  Facsimile: (602) 542-4377
8  consumer@azag.gov
   Valerie.marciano@azag.gov
9  *Attorneys for State of Arizona*

10
11              **UNITED STATES BANKRUPTCY COURT**
12                    **DISTRICT OF ARIZONA**

13  | In re: | Chapter 7 Proceedings |
14  | RUBEN DIAZ, | |
15  | Debtor. | Adversary Case No. 2:17-ap-00003-MCW |
16  | Social Security No(s).: xxx-xx-1325 | |
17  | | Administrative Case No. 2:16-bk-08654-MCW |
18  | | |
19  | STATE OF ARIZONA, ex rel. MARK BRNOVICH, Attorney General, | |
20  | | |
21  | Plaintiff, | **COMPLAINT TO DETERMINE DISCHARGEABILITY UNDER 11** |
22  | vs. | **U.S.C. § 523(a)(2)(A), 11 U.S.C. §** |
23  | RUBEN DIAZ, | **523(a)(4), AND 11 U.S.C. §** |
24  | | **523(a)(7).** |
25  | Defendant, | |

26
27
28

<5528188v.4>

Plaintiff State of Arizona, *ex rel.* MARK BRNOVICH, Attorney General (the "State"), for its complaint against Defendant Ruben Diaz (the "Defendant") hereby alleges as follows:

## STATEMENT OF JURISDICTION

1. This adversary proceeding is one arising in the Administrative Case No. Case No. 2:16-bk-08654-MCW, which was filed under Chapter 11 of the United States Bankruptcy Code, later converted to a case under Chapter 7 of the United States Bankruptcy Code, and is currently pending in this Court.

2. This Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 541.

3. Venue is proper in the United States Bankruptcy Court for the District of Arizona pursuant to 28 U.S.C. § 1409(a), and the Complaint is timely pursuant to Rule 4007, Federal Rules of Bankruptcy Procedure.

4. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). To the extent that any allegations are deemed to relate to non-core proceedings, said allegations fall within the purview of 28 U.S.C. § 157(b)(4).

## PARTIES

5. Plaintiff is the State of Arizona, *ex rel*. Mark Brnovich, Attorney General, who is authorized to bring this action under the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq*. and the Arizona Organized Crime, Fraud and Terrorism Act A.R.S. §§ 13-2301, *et seq*. to obtain injunctive relief in order to prevent the unlawful acts and practices alleged in this Complaint and to obtain other relief, including restitution, disgorgement of ill-gotten gains, civil penalties, costs of investigation and attorney's fees, all proceeds traceable to racketeering, or substitute assets in an amount equivalent to such proceeds.

6. Defendant is an Arizona resident, and the owner and operator of ProSolutions, LLC ("ProSolutions"), an Arizona limited liability company, and

Rancho Grande, LLC ("Rancho Grande"), an Arizona limited liability company during all times relevant to this Complaint.

## FACTUAL BACKGROUND

7. Beginning in November 2009 and continuing until present, through his businesses ProSolutions and Rancho Grande, Defendant offered services to Arizona consumers, including, but not limited to, finding buyers for consumers interested in short selling their homes, assisting consumers in locating real property for purchase, and obtaining financing for consumers to purchase real property.

8. Defendant advertised the above referenced services to Arizona consumers on the internet and through Spanish language flyers, radio stations, and periodicals.

9. In March of 2016, the State filed a lawsuit in the Superior Court of Arizona alleging Defendant's business practices violated the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq*. and the Arizona Organized Crime, Fraud and Terrorism Act A.R.S. §§ 13-2301, *et seq*., and requesting, among other things, awards of restitution, disgorgement, and civil penalties.

10. As detailed in Count One through Count Four of this Complaint, the restitution to be awarded to the State for Defendant's violations of the Arizona Consumer Fraud Act constitutes a non-dischargeable debt acquired through actual fraud, embezzlement, and/or fraud or defalcation when acting in a fiduciary capacity.

## COUNT ONE

### (Non-Dischargeability – 11 U.S.C. § 523(a)(2)(A) (Actual Fraud)

11. The State reiterates each and every allegation above as if set forth in full.

12. When consumers responded to Defendant's advertisements or word-of-mouth referrals, Defendant contacted the consumers to discuss the available services and the cost.

13. From 2010 to 2015, Defendant entered service agreements with consumers through his businesses ProSolutions and Rancho Grande.

14.     The ProSolutions service agreement explains that consumers must pay a $1,500-$2,000 charge for Defendant's services (a "service payment"), and the Rancho Grande service agreement requests a $9,900 service payment.

15.     Both service agreements offer consumers a full refund of the service payments if requested within three days of signing the service agreement, but, in some circumstances, Defendant modified the terms of the service agreement orally and/or in writing to give consumers a longer or indefinite period of time in which to receive a refund of the service payment.

16.     Defendant also required consumers to pay initial refundable deposits ("initial deposits") of varying amounts when entering the service agreement, and Defendant represented to consumers orally and in writing that he and his company would hold the initial deposit monies in trust until applied towards the purchase of homes selected by the consumers.

17.     If consumers found a home they wanted to purchase, Defendant then requested additional deposit monies while continuing to represent orally and in writing that all deposit monies would be held by the Defendant until applied as purchase down payments or earnest money on the properties selected by the consumers.

18.     During the discussions with consumers, Defendant made oral and written misrepresentations concerning the services he and his businesses would provide, the cost of his services, the entrustment and allocation of monies provided to Defendant by the consumers, and the availability of refunds upon cancellation of the service agreement.

19.     Defendant misrepresented that the service payment paid by consumers was a refundable deposit that would be held by Defendant until used for a purpose authorized by the paying consumer.

20.     Defendant misrepresented that the service payment was refundable for a period longer than three days.

///

21.     Defendant misrepresented that the deposit monies provided to Defendant by the consumers would be held by Defendant until applied towards the purchase of real property selected by the consumer.

22.     Defendant misrepresented that the deposit monies provided to Defendant by the consumers would be held by Defendant until used to secure a loan for the purchase or refinance of real property selected by the consumer.

23.     Defendant misrepresented that the deposit monies provided to Defendant by consumers would be refundable upon the cancellation of the agreement by the consumer.

24.     Defendant misrepresented that the deposit money provided to Defendant by the consumers would be held until used to secure a loan modification or reduced monthly loan payments for property owned by the consumers.

**Ruben Sanchez**

25.     On June 26, 2014, Defendant entered a ProSolutions service agreement with consumer Ruben Flores Sanchez in which Defendant agreed to assist Mr. Sanchez in the purchase of real property.

26.     At the time of entering the agreement, Defendant requested that Mr. Sanchez pay a deposit of $3,000, which Mr. Sanchez paid by personal check.

27.     At the time of entering the service agreement, Defendant orally made the misrepresentations specified in ¶¶ 21 and 23 to Mr. Sanchez.

28.     On June 27, 2014, Defendant deposited the check in a bank account used for the general expenses of his company and not in a separate trust account as agreed in the service agreement, and, within ten days of depositing the payment, Defendant used the money for an unauthorized purpose.

29.     In September 2015, after Defendant ignored his telephone calls, Mr. Sanchez sent text messages, emails, and letters to Defendant requesting a refund, but Defendant failed to respond to the requests or refund the deposit monies as agreed.

///

30.     The misrepresentations were material, and Defendant knew or should have known that the misrepresentations were false when he made them to Mr. Sanchez.

31.     Defendant made the misrepresentations with the intent to deceive Mr. Sanchez into paying him the $3,000.

32.     Mr. Sanchez justifiably relied on Defendant's misrepresentations, and his reliance on Defendant's misrepresentations caused him, at a minimum, $3,000 in damages.

**Jose Armenta Felix**

33.     On October 26, 2014, Defendant entered a Rancho Grande service agreement with consumer Jose Armenta Felix, in which Defendant agreed to assist Mr. Felix in the purchase of real property, and Defendant requested that Mr. Felix pay a deposit of $3,000.

34.     On October 26, 2014, Mr. Felix paid the $3,000 deposit to Defendant in cash, and authorized Defendant to apply the money exclusively towards the purchase of a home.

35.     At the time of entering the service agreement, Defendant orally made the misrepresentations specified in ¶¶ 21 and 23, and orally misrepresented that Defendant would refund the full $3,000 if requested by Mr. Felix within thirty days of entering the agreement.

36.     On November 9, 2014, Mr. Felix sent a letter to Defendant requesting a refund of the $3,000, and Defendant responded with a letter requesting more time to pay the refund, but Defendant has failed to refund the $3,000 to Mr. Felix.

37.     The misrepresentations were material, and Defendant knew or should have known that the misrepresentations were false when he made them to Mr. Felix.

38.     Defendant made the misrepresentations with the intent to deceive Mr. Felix into paying him the $3000.

///

39. Mr. Felix, who was unable to read the service agreement, justifiably relied on Defendant's misrepresentations, and his reliance on Defendant's misrepresentations caused him, at a minimum, $3,000 in damages.

**Juan Pablo Hurtado**

40. On October 27, 2014, Defendant entered a ProSolutions service agreement with consumer Juan Pablo Hurtado in which Defendant agreed to assist Mr. Hurtado in the purchase of real property, and Defendant requested that Mr. Hurtado pay a deposit of $3,000.

41. On October 27, 2014, Mr. Hurtado paid the $3,000 deposit to Defendant in cash, and authorized Defendant to apply the money exclusively towards the purchase of a home.

42. At the time of entering the service agreement or immediately prior to entering the service agreement, Defendant orally made the misrepresentations specified in ¶¶ 21 and 23 to Mr. Hurtado, and orally misrepresented that Defendant would refund the full $3,000 if requested by Mr. Hurtado within thirty days of entering the agreement.

43. On November 9, 2014, Mr. Hurtado sent a letter to Defendant requesting a refund of the $3,000, and Defendant responded with a letter requesting more time to pay the refund, but Defendant failed to refund the $3,000 deposit.

44. The misrepresentations were material and Defendant knew or should have known that the misrepresentations were false when he made them to Mr. Hurtado.

45. Defendant made the misrepresentations with the intent to deceive Mr. Hurtado into paying him the deposit money.

46. Mr. Hurtado, who was unable to read the agreement, justifiably relied on Defendant's oral misrepresentations, causing him, at a minimum, $3,000 in damages.

**Jose Urbieta**

47. On November 13, 2014, Defendant entered a ProSolutions service agreement with Jose Urbieta in which Defendant agreed to assist Mr. Urbieta in

refinancing his home, and Defendant requested that Mr. Urbieta pay a $1,500 service fee.

48.     On November 13, 2014, Mr. Urbieta paid Defendant $1,500 by personal check.

49.     At the time of entering the service agreement Defendant orally made the misrepresentation specified in ¶ 20 to Mr. Urbieta, and modified the service agreement to indicate that the service payment would be refundable indefinitely.

50.     Mr. Urbieta requested a refund from Defendant by email in December of 2014, and Defendant assured Mr. Urbieta that the refund would be paid within thirty days, but Defendant continued to request more time and ultimately failed to refund the $1,500 to Mr. Urbieta.

51.     The misrepresentations were material and Defendant knew or should have known that the misrepresentations made were false when he made them.

52.     Defendant made the misrepresentation specified in ¶ 20 with the intent to deceive Mr. Urbieta into paying him the $1,500 and never intended to hold the money or to refund the money upon request by Mr. Urbieta.

53.     Defendant has previously acknowledged in written communications with Mr. Urbieta that Defendant owes this debt to Mr. Urbieta and is in fact unable to refund the $1,500 payment as agreed.

54.     At the time Defendant requested Mr. Urbieta make a personal check to ProSolutions, LLC, the ProSolutions general business account had a negative balance and Defendant owed refunds to other consumers, indicating that Defendant had neither the means nor the intention of providing a refund if requested.

55.     Mr. Urbieta justifiably relied on Defendant's misrepresentations that the payment was fully refundable, and his reliance on Defendant's misrepresentations caused him, at a minimum, $1,500 in damages.

///

///

**Jose Rubio**

56.     On June 29, 2014, Defendant entered a ProSolutions service agreement with consumer Jose Rubio in which Defendant agreed to assist Mr. Rubio in securing a loan with an 8% interest rate for a $1,500 service fee.

57.     At the time of entering the agreement, Defendant requested that Mr. Rubio provide a $1,500 deposit and requested an additional $4,140 in deposit money on August 8, 2014.

58.     Mr. Rubio paid the initial $1,500 deposit by cashier's check when entering the agreement and paid the additional $4,140 by personal check on August 8, 2014.

59.     At the time of entering the service agreement Defendant orally and in writing made the misrepresentations specified in ¶¶ 22 and 23 to Mr. Rubio.

60.     At the time of requesting the additional $4,140 in deposit monies, Defendant orally made the misrepresentations in ¶¶22 and 23 to Mr. Rubio.

61.     On September 4, 2014, Mr. Rubio sent a letter to Defendant requesting a refund of $5,640, but Defendant refused to provide the refund.

62.     The misrepresentations were material, and Defendant knew or should have known that the misrepresentations were false and deceptive when he made them to Mr. Rubio.

63.     Defendant made the misrepresentations with the intent to deceive Mr. Rubio into paying him the $7,140.

64.     Mr. Rubio justifiably relied on Defendant's misrepresentations when entering the service agreement and paying the deposits when entering the service agreement, causing, at a minimum, $7,140 in damages.

**Jose Godoy**

65.     On April 10, 2013, Defendant entered a ProSolutions service agreement with consumer Jose Godoy in which Defendant agreed to assist Mr. Godoy in securing a loan to purchase property located at 3005 W. Polk St., Phoenix, Arizona 85009.

66. At the time of entering the agreement, Defendant requested that Mr. Godoy pay an initial deposit of $5,000 and later requested a second deposit of $8,000.

67. Mr. Godoy provided the initial $5,000 deposit by cashier's check on April 10, 2013, and the subsequent $8,000 deposit by cashier's check on May 7, 2013,

68. Mr. Godoy authorized Defendant to apply the deposit money exclusively towards the purchase of specific real property.

69. At the time of entering the service agreement or immediately prior to entering the service agreement, Defendant orally made the misrepresentations specified in ¶¶ 21 and 23 to Mr. Godoy.

70. After Defendant failed to secure the loan as agreed, Mr. Godoy requested a refund of the full $13,000.

71. Defendant agreed to provide the refund, but said that he could only pay the refund in weekly increments.

72. Defendant returned $700 on October 26, 2015, $400 on November 5, 2015, and $380 on November 21, 2015, but stopped repaying Mr. Godoy after that.

73. The misrepresentations were material, and Defendant knew or should have known that the misrepresentations were false when he made them to Mr. Godoy.

74. Defendant made the misrepresentations with the intent to deceive Mr. Godoy into paying him the deposit money.

75. Mr. Godoy, who could not read the agreement, justifiably relied on Defendant's misrepresentations, which caused, at a minimum, $11,520 in damages.

**Victor Nieves**

76. In February of 2014, Defendant entered a ProSolutions service agreement with consumer Victor Javier Nieves Rodriguez in which Defendant agreed to assist Mr. Nieves in securing two loans for the purchase of real estate.

77. At the time of entering the agreement, Defendant requested that Mr. Nieves pay a deposit of $15,000.

///

78.     Mr. Nieves provided the $15,000 deposit to Defendant by three personal checks on February 12, 13, and 14 of 2014.

79.     At the time of entering the service agreement, Defendant orally and in writing made the misrepresentations specified in ¶¶ 22 and 23 to Mr. Nieves.

80.     In early March of 2014, Mr. Nieves requested a refund of the full $15,000, but Defendant failed to refund any of the money.

81.     The misrepresentations were material, and Defendant knew or should have known that the misrepresentations were false when he made them.

82.     Defendant made the misrepresentations with the intent to deceive Mr. Nieves into paying him the deposit money.

83.     Mr. Nieves justifiably relied on Defendant's misrepresentations, and his reliance on Defendant's misrepresentations caused him, at a minimum, $15,000 in damages.

**Adriana Rodriguez**

84.     On September 17, 2014, Defendant entered a ProSolutions service agreement with consumer Adriana Rodriguez in which Defendant agreed to assist Adriana Rodriguez in purchasing real estate.

85.     At the time of entering the agreement, Ms. Rodriguez provided a $3,000 deposit to Defendant by personal check.

86.     At the time of entering the service agreement, Defendant orally and in writing made the misrepresentations specified in ¶¶ 21 and 23 to Adriana Rodriguez.

87.     In November of 2014, Defendant stopped answering Adriana Rodriguez' phone calls and emails, thereby refusing to provide the services as agreed while preventing her from requesting a refund.

88.     The misrepresentations were material, and Defendant knew or should have known that the misrepresentations were false or deceptive when he made them.

89.     Defendant made the misrepresentations with the intent to deceive Adriana Rodriguez into paying him the deposit money.

90.    Ms. Rodriguez justifiably relied on Defendant's misrepresentations, which caused, at a minimum, $3,000 in damages.

**Antonio Escobar**

91.    In August of 2008, Defendant offered to assist consumer Antonio Garcia Escobar in lowering the loan payment on his home located at 4807 W. Earll Dr., Phoenix, Arizona 85031.

92.    Defendant requested that Mr. Escobar provide him with $10,000 in deposit payments during 2011, which Mr. Escobar paid with $4,000 in cash in June of 2011, a check for $3,000 on August 7, 2011, and a check for $3,000 on September 22, 2011.

93.    At the time of requesting the money, Defendant orally made the misrepresentation specified in ¶ 24

94.    On June 5, 2012, Defendant's son purchased the home in a short sale.

95.    On June 6, 2012, in a notarized document, Defendant acknowledged the cancellation of his services by Mr. Escobar, acknowledged $10,000 deposit owed to Mr. Escobar, and agreed to fully refund the money in thirty days.

96.    Defendant has not returned the deposit money to Mr. Escobar.

97.    The misrepresentations were material, and Defendant knew or should have known that the misrepresentations were false when he made them to Mr. Escobar.

98.    Defendant made the misrepresentations with the intent to deceive Mr. Escobar into paying him the $10,000 in deposit money and to purchase Mr. Escobar's home in short sale.

99.    Mr. Escobar justifiably relied on Defendant's misrepresentations, which caused, at a minimum, $10,000 in damages.

**Carlos Soto**

100.    On October 6, 2011, Defendant offered to assist consumer Carlos Soto in reducing the monthly loan payment on his home or purchasing other real property.

101.    Defendant requested that Mr. Soto provide him with $9,000 in deposit

money and a $2,000 service fee that Defendant mischaracterized as a deposit when dealing with Mr. Escobar.

102. Mr. Soto gave Defendant control of $11,000 under the belief that the full $11,000 was a refundable deposit and authorized Defendant to use the money exclusively to lower Mr. Soto's loan payments or purchase real property for Mr. Soto.

103. At the time of entering the service agreement, Defendant orally and in writing made the misrepresentations specified in ¶¶ 21, 23, and orally made the misrepresentation specified in ¶¶ 19 and 24 to Mr. Soto.

104. In November of 2012, Mr. Soto cancelled the agreement, and requested a refund of the full $11,000 in writing on June 16, 2013, but Defendant has not returned the deposit money to Mr. Soto.

105. The misrepresentations were material, and Defendant knew or should have known that the misrepresentations were false when he made them to Mr. Soto.

106. Defendant made the misrepresentations with the intent to deceive Mr. Soto into paying him the $11,000 in deposit money.

107. Mr. Soto justifiably relied on Defendant's misrepresentations, which caused him, at a minimum, $11,000 in damages.

**Carlos Urias**

108. On July 29, 2010, Defendant entered an agreement with Carlos Golden Urias in which Defendant agreed to assist Mr. Urias in purchasing a home.

109. Pursuant to their agreement, Mr. Urias provided Defendant with a $7,300 deposit, and authorized Defendant to use the money exclusively to purchase a home for Mr. Urias.

110. At the time of entering the agreement, Defendant made the misrepresentations specified in ¶¶ 21 and 23 to Mr. Urias.

111. In December of 2010, Mr. Urias requested that Defendant refund the full $8,800, but Defendant failed to refund any of the money paid by Mr. Urias.

///

112.   The misrepresentations were material, and Defendant knew or should have known that the misrepresentations were false and deceptive when he made them.

113.   Defendant made the material misrepresentations with the intent to deceive Mr. Urias into paying him the $8,800.

114.   Mr. Urias justifiably relied on Defendant's misrepresentations when entering the service agreement and paying the deposit, which caused Mr. Urias, at a minimum, $8,800 in damages.

**Daniel Rodriguez Lopez and Maria Espinoza**

115.   On September 9, 2013, Defendant entered an agreement with Daniel Rodriguez Lopez and Maria Espinoza (hereinafter the "Espinozas") in which Defendant agreed to assist them in purchasing a home.

116.   Pursuant to their agreement, the Espinozas paid Defendant $15,000 in deposit money and authorized Defendant to use the money exclusively for the purchase of real property for the Espinozas.

117.   At the time of entering the agreement, Defendant made the misrepresentations specified in ¶21 and 23 to the Espinozas.

118.   After failing to find a suitable home, the Espinozas requested a refund of the $15,000 deposit, and Defendant orally agreed to provide the refund but then stopped speaking to the Espinozas and never refunded their money.

119.   The misrepresentations were material, and Defendant knew or should have known that the misrepresentations were false and deceptive when he made them.

120.   Defendant made the misrepresentations with the intent to deceive the Espinozas into paying him the $15,000 deposit.

121.   The Espinozas justifiably relied on Defendant's misrepresentations, which caused them, at a minimum, $15,000 in damages.

**Mario Matamoros**

122.   In April of 2015, consumer Mario Matamoros entered the Rancho Grande service agreement with Defendant, in which Defendant agreed to assist Mr.

Matamoros in purchasing real property.

123.    Per Defendant's request, Mr. Matamoros paid Defendant $19,800 in two cashier's checks, which Defendant misrepresented would be deposited into an escrow account for the purchase of 726 E. Dana Avenue, Mesa, Arizona, 85204.

124.    Defendant deposited $12,008.80 of the $19,800 into the escrow account in two deposits made on May 21, and June 5, of 2015, and kept the remaining $7,791 in deposit money.

125.    Defendant orally made the misrepresentations specified in ¶¶ 19 and 21 to Mr. Matamoros, mischaracterizing the entire $19,800 as a deposit and misrepresenting that all $19,800 would be applied towards the purchase of the house.

126.    The misrepresentations were material and Defendant knew or should have known that the misrepresentations were false or deceptive when he made them.

127.    Defendant made the misrepresentations with the intent to deceive Mr. Matamoros into paying him the deposit money.

128.    Mr. Matamoros justifiably relied on Defendant's material misrepresentations, which caused, at a minimum, $7,791 in damages.

**Estefania Jimenez**

129.    On September 6, 2012, Defendant entered a ProSolutions service agreement with consumer Etefania Jimenez in which Defendant agreed to assist Ms. Jimenez in the purchase of real property.

130.    Ms. Jimenez paid $18,000 in deposit money to the Defendant, using four cashier's checks dated September 6, September 20, November. 30, and December 3, 2012.

131.    At the time of entering the service agreement, Defendant orally made the misrepresentations specified in ¶¶ 21 and 23 to Ms. Jimenez.

132.    In December 2013, Ms. Jimenez requested a partial refund of her deposit payment, and Defendant returned $5,000.

///

133.    In 2015, Ms. Jimenez requested a refund of the remaining $13,000, and entered an agreement with Defendant on June 23, 2015, in which he agreed to repay her the remaining $13,000 in monthly installments of $500.

134.    After four installment payments of $500, Defendant stopped making payments and ceased all communication with Ms. Jiminez and her attorney.

135.    The misrepresentations were material, and Defendant knew or should have known that the misrepresentations were false when he made them.

136.    Defendant made the misrepresentations with the intent to deceive Ms. Jimenez into paying him the $18,000 deposit.

137.    Ms. Jimenez justifiably relied on Defendant's misrepresentations, which caused her, at a minimum, $11,000 in damages.

**Lilia Flores**

138.    On July 5, 2011, Defendant entered an agreement with consumer Lilia Flores in which Defendant agreed to assist Ms. Flores in the finance and purchase of real property.

139.    Ms. Flores paid Defendant a $1,000 deposit, and authorized Defendant to use the deposit exclusively towards the purchase of real property for Ms. Flores or the refinance of property already owned by Ms. Flores.

140.    At the time of entering the agreement, Defendant orally made the misrepresentations specified in ¶¶ 21, 22, 23 to Ms. Flores.

141.    On October 8, 2012, Ms. Flores requested a refund of her deposit payment, but Defendant never returned the $1,000.

142.    The misrepresentations were material, and Defendant knew or should have known that the misrepresentations were false when he made them to Ms. Flores.

143.    Defendant made the misrepresentations with the intent to deceive Ms. Flores into paying him the $1,000 deposit and a $2,000 service fee.

144.    Ms. Flores justifiably relied on Defendant's misrepresentations, which caused her, at a minimum, $3,000 in damages.

**Frank Badilla**

145.    On August 31, 2011, Defendant entered an agreement with consumer Frank Badilla in which Defendant agreed to assist Mr. Badilla in purchasing real property.

146.    As part of this agreement, Mr. Badilla provided Defendant with $14,000 in deposit money to be used exclusively as a down payment on the purchase of real property for Mr. Badilla.

147.    At the time of entering the agreement, Defendant orally made the misrepresentations specified in ¶¶ 21 and 23 to Mr. Badilla.

148.    On or about April 1, 2013, Mr. Badilla requested that Defendant refund the remaining $9,500, after which Defendant stopped communicating with Mr. Badilla.

149.    On April 10, 2014, Defendant refunded $1,500 of the deposit, and agreed in writing to refund the remaining $8,000 within three months, but Defendant never refunded the remaining $8,000 in deposit money.

150.    Defendant knew or should have known that the misrepresentations were false when he made them to Mr. Badilla.

151.    Defendant's misrepresentations were material and made with the intent to deceive Mr. Badilla into paying him $14,000 in deposit money.

152.    Mr. Badilla justifiably relied on Defendant's misrepresentations, and his reliance on Defendant's misrepresentations caused, at a minimum, $8,000 in damages.

**Maria Borredad Pinon**

153.    On May 21, 2014, Defendant entered a ProSolutions service agreement with consumer Maria Pinon in which Defendant agreed to assist Mrs. Pinon in purchasing a home.

154.    At the time of entering the service agreement, Defendant requested that Ms. Pinon pay him a $3,000, which Mrs. Pinon paid on May 23, 2014, and Defendant deposited the check into a general operating account of ProSolutions on May 27, 2014.

///

155.    On June 7, 2014, Defendant requested another $2,000 in deposit money from Ms. Pinon, misrepresenting that his boss required the additional deposit money.

156.    Mrs. Pinon paid Defendant the additional $2,000 in deposit money by cashier's check with the serial number 9496211101, and on June 9, 2014, and Defendant deposited the check in a bank account used for the general expenses of his company.

157.    At the time of entering the agreement, Defendant orally misrepresented to Mrs. Pinon that the full $3,000 was a deposit that would be held by Defendant until used as a down payment to purchase a home for Mrs. Pinon, and Defendant misrepresented that he would refund the $3,000 upon request by Ms. Pinon.

158.    At the time of requesting these deposits, Defendant made the misrepresentations specified in ¶¶ 21 and 23.

159.    On January 21, 2015, Mrs. Pinon cancelled the agreement by written letter and requested a refund of the full $5,000 she had paid to Defendant.

160.    In response to the letter Defendant agreed to provide the refund to Mrs. Pinon, but continued to ask for more time to refund the money and never refunded the money as agreed.

161.    The misrepresentations were material, and Defendant knew or should have known that the misrepresentations were false when he made them to Mrs. Pinon.

162.    Defendant made the misrepresentations with the intent to deceive Mrs. Pinon into paying him the deposit money.

163.    Mrs. Pinon justifiably relied on Defendant's misrepresentations, which caused her, at a minimum, $5,000 in damages.

**Patricia Sanchez Vega**

164.    On April 7, 2014, Defendant entered a ProSolutions service agreement with consumer Patricia Vega in which he agreed to help her purchase a house and requested that Ms. Vega provide him with a $3,000 deposit.

165.    Per the terms of the written agreement, $1500 of this payment was a

refundable deposit, and Ms. Vega paid the initial deposit with a $3,000 personal check numbered 2527.

166.    Ms. Vega found a home that she wanted to purchase and provide Defendant with an additional $7,000 in deposit money with ten money orders on April 30, 2014.

167.    At the time of Defendant requested the additional deposit, he made the misrepresentation specified in ¶21 misrepresented to Ms. Vega that he would use the $7000 as a down payment on the selected property.

168.    Ms. Vega later made numerous requests for a refund of the deposit money she had paid, but Defendant ignored Ms. Vega's requests.

169.    In September of 2015, Defendant contacted Ms. Vega and after admitting that he had spent her deposit money agreed to refund the full $10,000 that she had paid.

170.    Defendant refunded Ms. Vega a total of $850 with two checks drawn from separate bank accounts in the names of ProSolutions and Rancho Grande.

171.    The misrepresentations were material, and Defendant knew or should have known that the misrepresentations were false when he made them to Ms. Vega.

172.    Defendant misrepresented that he would only use the money towards the down payment on a home selected by Ms. Vega with the intent to deceive Ms. Vega into paying him the deposit money.

173.    Ms. Vega justifiably relied on Defendant's misrepresentations, which caused, at a minimum, $7,650 in damages.

<u>COUNT TWO</u>

**(Non-Dischargeability – 11 U.S.C. § 523(a)(4) (Embezzlement)**

174.    The State reiterates each and every allegation above as if set forth in full.

175.    From 2010 to 2015, Defendant orally and in writing used the misrepresentations described in ¶¶ 19, 21, 22, and 24 to obtain possession and control of consumer deposit monies.

-19-

176. From 2010 to 2015, despite agreeing to hold the consumer deposit monies in trust and exclusively use the consumer deposit monies for the purposes authorized by consumers, Defendant comingled the deposit monies in a general business account and used the consumer deposit monies for unauthorized purposes including, but not limited to, supporting himself and his businesses.

177. Circumstances surrounding Defendant's acquisition of the deposit monies indicates fraud, including comingling deposit monies with general business accounts, failing to keep the monies in separate trust accounts as agreed, using the deposit monies in unauthorized ways soon after receiving the deposits, continuing collection of deposit monies while unable to refund the deposit monies collected from other consumers, acquiring the deposits using false pretenses, and refusing to refund deposit monies when requested.

**Ruben Flores Sanchez**

178. On June 26, 2014, Ruben Flores Sanchez gave Defendant control of the $3,000 deposit, and authorized Defendant to use the deposit money exclusively towards the purchase of property for Mr. Sanchez.

179. Defendant no longer has the deposit money, and failed to refund the deposit money or use the deposit money as authorized, and, therefore, Defendant used the deposit monies for an unauthorized purpose.

180. On June 27, 2014, Defendant deposited the check in a bank account used for the general expenses of his company and not in a separate trust account as agreed in the service agreement, and used the money for an unauthorized purpose within ten days of depositing the payment.

**Jose Armenta Felix**

181. On October 26, 2014, Jose Armenta Felix gave Defendant control of a $3,000 deposit, and authorized Defendant to use the deposit money exclusively towards the purchase of property for Mr. Felix.

182. Defendant no longer has the deposit money, and failed to refund the

deposit money or use the deposit money as authorized, and, therefore, Defendant used the deposit monies for an unauthorized purpose.

183. Defendant has previously acknowledged in written and oral communications with Mr. Felix and others that he is unable to refund the deposit he agreed to hold in trust for Mr. Felix, the refund was requested shortly after the deposit was paid, and Defendant failed to establish a separate trust as agreed, indicating the fraudulent circumstances in which the money was acquired.

**Juan Pablo Hurtado**

184. On October 27, 2014, Juan Pablo Hurtado gave Defendant control of $3,000 in deposit money, and authorized Defendant to use the deposit money exclusively towards the purchase of property for Mr. Hurtado.

185. Defendant no longer has the deposit money, and failed to refund the deposit money or use the deposit money as authorized, and, therefore, Defendant used the deposit monies for an unauthorized purpose.

186. Defendant has previously acknowledged in written and oral communications with Mr. Hurtado and others that he is unable to refund the deposit he agreed to hold in trust for Mr. Hurtado, the refund was requested shortly after the deposit was paid, and Defendant failed to establish a separate trust as agreed, indicating the fraudulent circumstances in which the money was acquired.

**Jose Rubio**

187. On June 29, 2014, and August 4, 2014, consumer Jose Rubio gave Defendant control of a total of $5,640 in deposit money, and authorized Defendant to use the deposit money exclusively towards the down payment of a loan.

188. Defendant no longer has the deposit money and failed to refund the deposit money or use the deposit money as authorized, and, therefore, Defendant used the deposit monies for an unauthorized purpose.

189. Defendant has previously acknowledged in written and oral communications with Mr. Rubio that he owes this debt to Mr. Rubio, Defendant failed

to deposit the money in a separate trust account as agreed, and Defendant misrepresented the terms of the loan he could acquire for Mr. Rubio, indicating the fraudulent circumstances in which the money was acquired.

**Jose Godoy**

190.    On April 10, 2013, and May 7, 2013, consumer Jose Godoy gave Defendant control of a total of $13,000 of deposit money and authorized Defendant to use the deposit money exclusively towards the purchase of specific property.

191.    Defendant no longer has the deposit money and failed to refund $11,520 of the deposit money or use $11,520 of deposit money as authorized, and, therefore, Defendant used the deposit monies for an unauthorized purpose.

192.    Defendant has previously acknowledged in written and oral communications with Mr. Godoy and the State that he owes this debt to Mr. Godoy, and Defendant immediately comingled the deposit money in a general business account, indicating the fraudulent circumstances in which the money was acquired.

**Victor Nieves**

193.    On through several payments made on February 13, 14, 15 of 2014, consumer Victor Javier Nieves Rodriguez gave Defendant control of a total of $15,000 in deposit money and authorized Defendant to use the deposit money exclusively towards securing two loans for Mr. Nieves.

194.    Defendant no longer has the deposit money and failed to refund the deposit money or use the deposit money as authorized, and, therefore, Defendant used the deposit monies for an unauthorized purpose.

195.    Defendant has previously acknowledged in written and oral communications with Mr. Nieves that he owes this debt, but was unable or unwilling to refund the money when requested mere weeks after it was provided by Mr. Nieves, indicating the fraudulent circumstances in which the money was acquired.

**Adriana Rodriguez**

196.    On September 17, 2014, Adriana Rodriguez gave Defendant control of

$3,000 in deposit money and authorized Defendant to use the deposit money exclusively towards purchasing a home for Ms. Rodriguez.

197. Defendant no longer has the deposit money and failed to refund the deposit money or use the deposit money as authorized, and, therefore, Defendant used the deposit monies for an unauthorized purpose.

198. Defendant failed to provide his services as agreed, commingled the funds in a general bank account for his business ProSolutions, failed to put the deposit in a separate trust as agreed, and severed communication with Adriana Rodriguez, indicating the fraudulent circumstances in which the money was acquired.

**Antonio Escobar**

199. Antonio Escobar paid Defendant $4,000 in cash in June of 2011, $3,000 by check on August 7, 2011, and $3,000 by check on September 22, 2011, and authorized Defendant to use the deposit money exclusively towards reducing the monthly payment on Mr. Escobar's home or the purchase of real property for Mr. Escobar.

200. Defendant no longer has the $10,000 in deposit money and failed to refund the deposit money or use the deposit money as authorized, and, therefore, Defendant used the deposit money for an unauthorized purpose.

201. Defendant failed to provide his services as agreed, commingled the deposit payment with monies used to support his business or pay personal expenses, and ceased all communication with the Mr. Escobar, indicating the fraudulent circumstances in which the money was acquired.

**Carlos Soto**

202. From October 14, 2011 through February of 2012, Carlos Soto gave Defendant control of $11,000 in deposit money while authorizing Defendant to use the deposit money exclusively to assist consumer Carlos Soto in securing a loan modification on an existing home, or as a down payment for the purchasing real property.

203.  Defendant no longer has the deposit money and failed to refund the deposit money or use the deposit money as authorized, and, therefore, Defendant used the deposit monies for an unauthorized purpose.

204.  Defendant failed to provide his services as agreed, commingled the deposit payment with monies used to support his business or pay personal expenses, indicating the fraudulent circumstances in which the debt was acquired.

**Carlos Urias**

205.  Pursuant to an agreement entered July 29, 2010, Carlos Urias gave Defendant control of $7,300 in deposit money while authorizing Defendant to use the deposit money exclusively for the purchasing real property for Mr. Urias.

206.  Defendant no longer has the deposit money and failed to refund the deposit money or use the deposit money as authorized, and, therefore, Defendant used the deposit monies for an unauthorized purpose.

207.  Defendant failed to separate the deposit monies provided by Mr. Urias and was unable or unwilling to refund the money as agreed, indicating the fraudulent circumstances in which the debt was acquired.

**Daniel Rodriguez and Maria Espinoza**

208.  Pursuant to an agreement entered September 9, 2013, Daniel Rodriguez and Maria Espinoza (the "Espinozas") gave Defendant control of $15,000 in deposit money while authorizing Defendant to use the deposit money exclusively for the purchase of real property for the Espinozas.

209.  Defendant no longer has the deposit money and failed to refund the deposit money or use the deposit money as authorized, and, therefore, Defendant used the deposit monies for an unauthorized purpose.

210.  Defendant failed to hold the deposit monies provided by the Espinozas in separate trust, and was unable or unwilling to refund the money as agreed, indicating the fraudulent circumstances in which the money was acquired.

///

**Mario Matamoros**

211. Pursuant to an agreement entered in April of 2015, Mario Matamoros gave Defendant control of $19,800 in deposit money while authorizing Defendant to use the deposit money exclusively as a down payment to purchase a specific property.

212. Defendant failed to refund or apply $7,791.20 of the deposit money towards the purchase price as agreed, and, therefore, used the $7,791.20 in an unauthorized manner.

213. Defendant mischaracterized the cost of his services, told Mr. Matamoros that he would have problems with the FBI if he deposited the money into the escrow account on his own, indicating the fraudulent circumstances in which the money was acquired.

**Estefania Jimenez**

214. Pursuant to an agreement entered in September 6, 2012, Estefania Jimenez gave Defendant control of $18,000 in deposit money while authorizing Defendant to use the deposit money exclusively to purchase real property for Ms. Jimenez.

215. Defendant failed to refund or apply $11,000 of the deposit money towards the purchase of a home for Ms. Jimenez, and, therefore, used the $11,000 in an unauthorized manner.

216. Defendant failed to hold the money in a separate trust account and admitted spending the money on an unauthorized purpose, indicating the fraudulent circumstances in which the money was acquired.

**Lilia Flores**

217. Pursuant to an agreement entered on July 5, 2011, Lilia Flores gave Defendant control of $1,000 in deposit money while authorizing Defendant to use the deposit money exclusively as a down payment to purchase real property for Ms. Flores or to reduce her existing mortgage payment.

///

218. Defendant failed to refund or apply the $1,000 deposit as authorized, and no longer has the money, and, therefore, used the $1,000 in an unauthorized manner.

219. Defendant failed to hold the money in a separate trust account and originally entered into an agreement with Ms. Flores by misrepresenting his ability to secure a loan modification, indicating the fraudulent circumstances in which the money was acquired.

**Frank Badilla**

220. Pursuant to an agreement entered on August 31, 2011, Frank Badilla gave Defendant control of $14,000 in deposit money while authorizing Defendant to use the money exclusively as a down payment to purchase property for Mr. Badilla.

221. Defendant failed to refund or apply $8,000 of the deposit money as authorized, and no longer has the money, and, therefore, used the $8,000 in an unauthorized manner.

222. Defendant failed to hold the money in a trust account, and collected the deposit by misrepresenting Mr. Badilla's ability to repurchase his home after a short sale, indicating the fraudulent circumstances in which the money was acquired.

**Maria Borredad Pinon**

223. On May 23, and June 6, 2014, Maria Borredad Pinon gave Defendant control of $5,000 in deposit money, and authorized Defendant to use the deposit money towards the purchase of property for Mrs. Pinon.

224. Defendant no longer has the deposit money and failed to refund the deposit money or use the deposit money as authorized, and within days of receiving each payment, Defendant used the money for unauthorized purposes.

225. Defendant comingled the deposit funds in a bank account used for personal expenses and the general expenses of his company and not in a separate trust account as agreed in the service agreement, spent the money within days of depositing the checks, and falsely claimed that his boss required the additional $2,000 in deposit money, indicating the fraudulent circumstances in which the money was acquired.

**Patricia Sanchez Vega**

226.    On April 30, 2014, Patricia Vega gave Defendant control of $7,000 in deposit money, and authorized Defendant to use the deposit money exclusively towards the purchase of property for Ms. Vega.

227.    In September of 2015, Defendant admitted that he failed to timely refund Ms. Vega because he had spent the money on an unauthorized purpose.

228.    Defendant commingled the $8,500 in deposit money in a general business account for ProSolutions, indicating the fraudulent circumstances in which the money was acquired.

COUNT THREE

**(Non-Dischargeability – 11 U.S.C. § 523(a)(4) (Fiduciary Defalcation)**

229.    The State reiterates each and every allegation above as if set forth in full.

230.    In agreeing to hold deposit money for consumers until used for a specific purpose for the benefit of the consumer, Defendant created a trust and entered a fiduciary relationship with consumers.

231.    Defendant misappropriated the deposits entrusted to him for a purpose other than that authorized by the consumers, which Defendant knew or should have known was a violation of his fiduciary duty.

**Ruben Flores Sanchez**

232.    On June 26, 2014, Defendant entered a fiduciary relationship with Ruben Flores Sanchez by agreeing to hold and control the deposit money for his benefit and had a duty to use the deposit money only as authorized.

233.    Defendant misappropriated the $3,000 deposit entrusted to him for a purpose other than that authorized by Mr. Sanchez, which Defendant knew or should have known was a violation of his fiduciary duty.

**Jose Armenta Felix**

234.    On October 26, 2014, Defendant entered a fiduciary relationship with Jose Armenta Felix through the means specified in ¶ 230 and had a duty to use the

deposit money only as authorized.

235. Defendant misappropriated the $3,000 deposit entrusted to him for a purpose other than that authorized by Mr. Felix, which Defendant knew or should have known was a violation of his fiduciary duty.

**Juan Pablo Hurtado**

236. Defendant entered a fiduciary relationship with Juan Pablo Hurtado through the means specified in ¶ 230 and had a duty to use the deposit money only as authorized.

237. Defendant misappropriated the $3,000 deposit entrusted to him for a purpose other than that authorized by Mr. Hurtado, which Defendant knew or should have known was a violation of his fiduciary duty.

**Jose Rubio**

238. Defendant entered a fiduciary relationship with Jose Rubio through the means specified in ¶ 230 and had a duty to use the deposit money only as authorized.

239. Defendant misappropriated the $5,640 deposit entrusted to him for a purpose other than that authorized by Mr. Rubio, which Defendant knew or should have known was a violation of his fiduciary duty.

**Jose Godoy**

240. Defendant entered a fiduciary relationship with Jose Godoy through the means specified in ¶ 230 and had a duty to use the deposit money only as authorized.

241. Defendant misappropriated at least $11,520 of the deposit entrusted to him for a purpose other than that authorized by Mr. Godoy, which Defendant knew or should have known was a violation of his fiduciary duty.

**Victor Nieves**

242. Defendant entered a fiduciary relationship with Victor Nieves through the means specified in ¶ 230 on February 13, 2014, and had a duty to use the deposit money only as authorized.

243. Defendant misappropriated the $15,000 deposit entrusted to him for a

purpose other than that authorized by Mr. Nieves, which Defendant knew or should have known was a violation of his fiduciary duty.

**Adriana Rodriguez**

244.    Defendant entered a fiduciary relationship with Adriana Rodriguez through the means specified in ¶ 230 on September 17, 2014 and had a duty to use the deposit money only as authorized.

245.    Defendant misappropriated the $3,000 deposit entrusted to him for a purpose other than that authorized by Adriana Rodriguez, which Defendant knew or should have known was a violation of his fiduciary duty.

**Antonio Escobar**

246.    Defendant entered a fiduciary relationship with Antonio Escobar through the means specified in ¶ 230 in June of 2011 and reaffirmed that fiduciary relationship with Mr. Escobar on August 7, 2011 and September 17, 2014.

247.    Defendant had a duty to use the deposit money only as authorized.

248.    Defendant misappropriated the $10,000 deposit entrusted to him for a purpose other than that authorized by Antonio Escobar, which Defendant knew or should have known was a violation of his fiduciary duty.

**Carlos Soto**

249.    Defendant entered a fiduciary relationship with Carlos Soto through the means specified in ¶ 230 on October 6, 2011, and Defendant had a duty to use the deposit money only as authorized.

250.    Defendant misappropriated the $11,000 deposit entrusted to him for a purpose other than that authorized by Mr. Soto, which Defendant knew or should have known was a violation of his fiduciary duty.

**Carlos Urias**

251.    Defendant entered a fiduciary relationship with Carlos Urias through the means specified in ¶ 230 on July 29, 2010, and Defendant had a duty to use the deposit money only as authorized.

252.   Defendant misappropriated the $7,300 deposit entrusted to him for a purpose other than that authorized by Mr. Urias, which Defendant knew or should have known was a violation of his fiduciary duty

**Daniel Rodriguez and Maria Espinoza**

253.   Defendant entered a fiduciary relationship with Daniel Rodriguez and Maria Espinoza through the means specified in ¶ 230 on September 9, 2013, and Defendant had a duty to use the deposit money only as authorized.

254.   Defendant misappropriated the $15,000 deposit entrusted to him for a purpose other than that authorized by the Espinozas, which Defendant knew or should have known was a violation of his fiduciary duty

**Mario Matamoros**

255.   Defendant entered a fiduciary relationship with Mario Matamoros through the means specified in ¶ 230 in April of 2015, and Defendant had a duty to use the deposit money only as authorized.

256.   Defendant misappropriated $7,791.20 of the $19,800 deposit entrusted to him for a purpose other than that authorized by Mr. Matamoros, which Defendant knew or should have known was a violation of his fiduciary duty

**Estefania Jimenez**

257.   Defendant entered a fiduciary relationship with Estefania Jimenez through the means specified in ¶ 230 on September 6, 2012, and Defendant had a duty to use the deposit money entrusted with him only as authorized by Ms. Jimiez.

258.   Defendant misappropriated $11,000 of the deposit money entrusted to him for a purpose other than that authorized by Ms. Jiminez, which Defendant knew or should have known was a violation of his fiduciary duty

**Lilia Flores**

259.   Defendant entered a fiduciary relationship with Lilia Flores through the means specified in ¶ 230 on July 5, 2011, and Defendant had a duty to use the deposit money entrusted with him only as authorized by Ms. Flores.

260. Defendant misappropriated the $1,000 deposit entrusted to him for a purpose other than that authorized by Ms. Flores, which Defendant knew or should have known was a violation of his fiduciary duty.

**Frank Badilla**

261. Defendant entered a fiduciary relationship with Frank Badilla through the means specified in ¶ 230 on August 31, 2011, and Defendant had a duty to use the deposit money entrusted with him only as authorized by Mr. Badilla.

262. Defendant misappropriated the $8,000 of the deposit money entrusted to him for a purpose other than that authorized by Mr. Badilla, which Defendant knew or should have known was a violation of his fiduciary duty.

**Maria Borredad Pinon**

263. On May 23, 2014, Defendant entered a fiduciary relationship with Maria Pinon, in the manner specified in ¶ 230, and Defendant had a duty to use the deposit money only as authorized by Ms. Pinon.

264. Defendant misappropriated the $5000 deposit entrusted to him for a purpose other than that authorized by Mrs. Pinon, which Defendant knew or should have known was a violation of his fiduciary duty.

**Patricia Sanchez Vega**

265. On April 7, 2014, Defendant entered a fiduciary relationship with Patricia Vega in the manner specified in ¶ 230, and had a duty to use the deposit money only as authorized by Ms. Vega.

266. Defendant misappropriated the $7,650 of the deposit entrusted to him for a purpose other than that authorized by Mrs. Vega, which Defendant knew or should have known was a violation of his fiduciary duty.

<u>COUNT FOUR</u>

**(Non-Dischargeability – 11 U.S.C. § 523(a)(2)(A) (Fraud Unrelated to Service Agreements)**

267. The State reiterates each and every allegation above as if set forth in full.

268. From 2010 through 2015, Defendant offered to assist consumers in purchasing real estate, and, during that period, Defendant showed consumers houses that were owned by Defendant, owned by a company operated by Defendant, or owned by a company or individual associated with Defendant.

269. If and when consumers found a home that they wanted to purchase, Defendant requested that they make a down payment of at least 10% of the home's value.

270. After the consumers agreed to purchase the house for a specified price, Defendant would supply the consumers with various real estate contracts and other documents and described the contracts as necessary to purchase the home.

271. In some instances, Defendant supplied consumers with a purchase contract and a lease agreement document that, unbeknownst to the consumers, contained terms that purportedly superseded the purchase contract, structuring the transaction as a lease with an option to purchase, while the consumers were led to believe that they were purchasing the residence.

272. From 2010 through 2015, Defendant orally misrepresented to consumers the nature and effect of the terms of the agreement documents and deceptively omitted material terms of the agreement and transaction.

273. Defendant misrepresented that the above described lease agreement documents were part of the purchase agreements, failing to disclose that under such documents the consumers would be construed to be tenants rather than owners.

274. Defendant misrepresented that consumers signing lease agreements with an option to purchase would become the owners of the property upon entering the agreements and were purchasing the property at the time of signing.

275. Defendant misrepresented that the down payments paid by the consumers would immediately give them equity in the houses.

276. Defendant misrepresented that monthly payments Defendant labeled as lease payments to be made by consumers under the lease agreements were payments

on a loan used to secure the purchase of the home.

277. When explaining the terms of the agreement to the consumers, Defendant deceptively omitted the existence and details of the lease agreement document and its effect.

278. When explaining the terms of the agreement to consumers, Defendant deceptively omitted the existence and details of the clause in the agreements that forfeited all deposits, earnest money, and purported rent payments to the seller if the buyer breached the purported lease agreement.

279. Defendant misrepresented that he would transfer title to the consumers at the end of the transaction term.

280. Defendant misrepresented the amount of time that consumers would have to pay loans used to purchase the property.

281. Under purported lease agreements, Defendant misrepresented that consumers would pay a specific amount of money each month despite the fact that payment could be and was unilaterally raised by the Defendant.

282. When explaining the purported lease contract with consumers and the monthly payment, Defendant deceptively omitted that by failing to pay the increased amount of monthly payment requested by the Defendant in full, consumers would forfeit all deposits, earnest money, purported rent payments, and rights to purchase the property for a specific price.

283. Upon entering purported lease agreements with options to purchase with consumers, Defendant misrepresented that consumers would have twelve months to pay the purchase down payment, when consumers only had six months to pay.

**Pedro Cortes Mejia**

284. On January 1, 2013, Pedro Cortes Mejia entered an agreement with Defendant for the purchase of 5525 S. 7th Dr., Phoenix, Arizona 85041, for a purchase price of $82,000 and a down payment of $10,000.

///

285. At the time of entering the purchase agreement, Defendant orally made the misrepresentations and omissions specified in ¶¶ 273-278 in his explanation of the terms and effect of the agreement to Mr. Mejia.

286. Defendant also made the misrepresentations and omissions specified in ¶¶ 281-282.

287. Defendant then raised Mr. Mejia's monthly payment by $100 and used Mr. Mejia's refusal to pay the additional amount as a pretext to void Mr. Mejia's purchase option while retaining the $10,000 deposit payments and earnest money Mr. Mejia had already paid.

289. In justifiable reliance on the oral misrepresentations, Mr. Mejia entered a purchase agreement and purported lease agreement, paid $3,000 in closing costs, paid a down payment of $10,000, and made monthly payments of at least $731.42 for the next thirty-two months, totaling at a minimum, $36,000 in damages proximately caused by Defendant's misrepresentations and omissions.

290. The misrepresentations were material, and Defendant knew or should have known that the misrepresentations and omissions described in ¶¶ 273-278, and 281-282 were false and/or deceptive when making them to Mr. Mejia.

291. At the time of making the misrepresentations and omissions described in ¶¶ 273-278 and 281-282, Defendant intended to deceive Mr. Mejia.

**Nancy Blancas and Leonardo Raymundo**

292. On August 1, 2014, Nancy Blancas and Leonardo Raymundo (hereinafter the "Raymundos"), under the belief that they were purchasing the property, signed a purported lease with option to purchase agreement document relating to the property located at 523 W. Roanoke Ave., Phoenix, Arizona 85035, with a purchase price of $112,000, a down payment of $6,000, an earnest payment of $4,000, and a monthly payment of $895.

293. At the time of entering the purchase agreement, Defendant orally made the misrepresentations and omissions specified in ¶¶ 273-274, 277, and 283 in his

explanation of the terms and effect of the agreement to the Raymundos.

294.   Several months after entering the agreement, Defendant told the Raymundos that they had entered a lease agreement with an option to purchase, and not a purchase agreement as he had told them originally.

295.   Likewise, several months after entering the agreement, Defendant told the Raymundos that they would only have six months to pay the full $10,000 down payment and earnest money, and not the full year as he had told them originally.

296.   The Raymundos were unable to pay the full $10,000 in the reduced timeframe, so they cancelled the contract in reliance on Defendants' misrepresentation that the $7,500 in earnest money and down payments that they had given to Defendant would be refunded.

297.   After the cancellation of the agreement, Defendant continued to claim that he would refund the Raymundos, but Defendant requested more time and ultimately failed to provide the refund.

298.   In justifiable reliance on the misrepresentations, the Raymundos entered a purchase agreement, paid $7,500 in earnest money and down payments and made monthly payments of $895 for six months, totaling at least $12,870 in damages proximately caused by Defendant's misrepresentations and omissions.

299.   The misrepresentations were material, and Defendant knew or should have known that the misrepresentations and omissions were false and deceptive.

300.   Defendant made the misrepresentations and omissions with the intent to deceive the Raymundos.

**Eduardo Parente**

301.   On April 1, 2014, Consumer Eduardo Parente entered a purported lease agreement with and option to purchase with Defendant's company, ProSolutions, LLC, for the purchase of 3017 W. Mackenzie Dr., Phoenix, Arizona 85017, for a purchase price of $75,000, an earnest payment of $5,000, and a monthly payment of $665 under the belief that he was purchasing the property

302.   At the time of entering the purchase agreement, Defendant orally made the misrepresentations and omissions specified in ¶¶ 273-277, and 281 in his explanation of the terms and effect of the agreement to Mr. Parente.

303.   Defendant later increased Mr. Parente's monthly payments by $100.

304.   In justifiable reliance on the oral misrepresentations, Mr. Parente entered a purchase agreement and purported lease agreement, paid a $5,000 earnest payment and made monthly payments of at least $665 for at least the next forty-two months, totaling at a minimum, $32,300 in damages proximately caused by Defendant's misrepresentations and omissions.

305.   The misrepresentations were material, and Defendant knew or should have known that the misrepresentations and omissions described in ¶¶ 273- 277 were false and deceptive when he made them to Eduardo Parente.

306.   Defendant made the misrepresentations and omissions with the intent to deceive Mr. Parente.

**Miguel Valenzuela and Guadalupe Beltran**

307.   On May 1, 2011, Consumer Guadalupe Beltran signed a one year lease agreement and option to purchase relating to the property located at 5308 W. Roanoke Ave., Phoenix, Arizona 85035 for a purchase price of $58,000 and an earnest payment of $10,000, believing that she was purchasing the property.

308.   At the time of entering the purchase agreement, Defendant orally made the misrepresentations and omissions specified in ¶¶ 274-276 and 278 in his explanation of the terms and effect of the agreement to Guadalupe Beltran and Miguel Valenzuela.

309.   After the one year term of the lease agreement expired, Defendant failed to transfer title and continued to collect lease payments of at least $650 a month for two more years.

310.   When consumers Guadalupe Beltran and Miguel Valenzuela confronted Defendant about his failure to transfer title, he refused to apply any of the monthly

payments made for the three prior years towards the purchase price of the home.

311.    The misrepresentations were material, and Defendant knew or should have known that the misrepresentations and omissions described in ¶¶ 274-276 and 278 were false and deceptive when he made them to Guadalupe Beltran and Miguel Valenzuela.

312.    Defendant made the misrepresentations and omissions with the intent to deceive Guadalupe Beltran and Miguel Valenzuela.

313.    In justifiable reliance on the oral misrepresentations specified in ¶¶ 274-276 and 278, Ms. Beltran signed the purported lease agreement with a purchase option and made monthly payments of at least $650 for at least thirty-six months, and Ms. Beltran's reliance on Defendant's misrepresentations caused, at a minimum, $23,400.

**Francisco Serrano**

314.    On April 24, 2013, Consumer Francisco Serrano entered an agreement with Defendant's company, ProSolutions, for the purchase of 3509 W. Tonto Dr., Phoenix, Arizona 85009 for a purchase price of $62,000 and a down payment of $10,000.

315.    At the time of entering the purchase agreement, Defendant orally made the misrepresentations and omissions specified in ¶¶ 273-277 in his explanation of the terms and effect of the agreement to Mr. Serrano.

316.    When confronted by Mr. Serrano, Defendant agreed to transfer title to Mr. Serrano, but refused to apply the $11,016 in monthly payments previously paid by Mr. Serrano towards the purchase price of the home.

317.    In justifiable reliance on the oral misrepresentations, Mr. Serrano entered a purchase agreement and purported lease agreement and made monthly payments of at least $648 for at least the next seventeen months, totaling at a minimum, $11,016 in damages proximately caused by Defendant's misrepresentations and omissions.

318.    The misrepresentations and omissions were material, and Defendant knew or should have known that the misrepresentations and omissions described in ¶¶

273- 277 were false or deceptive when he made them to Mr. Serrano.

319.    Defendant made the misrepresentations and omissions described in ¶¶ 273-277, with the intent to deceive Mr. Serrano.

**Diego Rodriguez**

320.    On February 1, 2014, Consumer Diego Rodriguez entered an agreement with Defendant's company, Rancho Grande, LLC, for the purchase of 8810 W. Catalina Dr., Phoenix, Arizona 85037 for a purchase price of $140,000 and an earnest money payment of $15,000.

321. At the time of entering the purchase agreement, Defendant orally made the misrepresentations and omissions specified in ¶¶ 273- 277 in his explanation of the terms and effect of the agreement to Mr. Rodriguez.

322.    In justifiable reliance on the oral misrepresentations, Mr. Rodriguez entered a purchase agreement and purported lease agreement with Rancho Grande, LLC, made monthly payments of $925 for five months, and monthly payments of $1,025 for six months, totaling at a minimum, $10,775 in damages proximately caused by Defendant's misrepresentations and omissions.

323.    The misrepresentations were material, and Defendant knew or should have known that the misrepresentations and omissions described in ¶¶ 273-277 were false or deceptive when he made them to Diego Rodriguez.

324.    Defendant made the misrepresentations described in ¶¶ 273-277, with the intent to deceive Mr. Rodriguez.

**Margarito Duarte**

325.    On April 1, 2014, Consumer Margarito Duarte entered an agreement with Defendant's company, Mozart Clan, LLC, for the purchase of 6729 W. Garfield Street, Phoenix, Arizona 85043, for a purchase price of $125,000 and a deposit or earnest payment of approximately $9,000.

326.    At the time of entering the purchase agreement, Defendant orally made the misrepresentations and omissions specified in ¶ 280 to Mr. Duarte, when, in fact,

Mr. Duarte was required to pay the full balance of $115,000 loan after the first year.

327.   In justifiable reliance on the oral misrepresentations, Mr. Duarte entered a purchase agreement, paid a $9,000 earnest payment and made monthly payments of at least $845 for at least seven months, totaling at a minimum, $14,915 in damages proximately caused by Defendant's misrepresentations and omissions.

328. The misrepresentation made by Defendant was material, and Defendant knew or should have known that the misrepresentation described in ¶ 280 was false and deceptive when he made it to Mr. Duarte

329.   Defendant made the misrepresentation in ¶ 280 with the intent to deceive Mr. Duarte.

**Amada Margarita Garcia**

330.   On August 15, 2011, Consumer Amada Garcia entered an agreement with Defendant's company, ProSolutions, LLC, to purchase 3112 W. Taylor St., Phoenix, Arizona 85009, for $41,000 with $5,000 down, and a $500 monthly payment.

331.   At the time of entering the purchase agreement, Defendant orally made the misrepresentations specified in ¶¶ 273-276 to Amada Garcia.

332.   In justifiable reliance on the oral misrepresentations, Amada Garcia entered a purchase agreement, paid a $5,000 down payment, made monthly payments of at least $500 a month for at least forty-eight months, and made substantial improvements to the property totaling at a minimum, $30,000 in damages proximately caused by Defendant's misrepresentations and omissions.

333. The misrepresentations are material, and Defendant knew or should have known that the misrepresentations described in ¶¶ 273-276 were false and deceptive when they were made.

334.   Defendant made the misrepresentations in ¶¶ 273-276 with the intent to deceive Amada Garcia.

**Jose Burgueno**

335.   In December of 2012, Defendant assisted Mr. Burgueno in purchasing a

home located at 2905 W. Citrus Way, Phoenix, Arizona 85017, for $56,000 with an $11,000 down payment.

336.   When explaining the terms of the loan agreement to Mr. Burgueno, Defendant orally made the misrepresentation specified in ¶ 280, falsely leading Mr. Burgueno to believe he had three years instead of two years in which to pay the balance of the loan.

337.   In November of 2014, Mr. Burgueno learned that he only had a month to pay the remaining balance on his home loan and was forced to sell his house.

338.   In justifiable reliance on the oral misrepresentation, Jose Burgueno entered the purchase agreement, made a $7,000 down payment, paid $16,947 in monthly payments, and made substantial improvements to the property totaling at a minimum, $23,947 in damages caused by Defendant's misrepresentations.

339.   The misrepresentation was material, and Defendant knew or should have known that the misrepresentation was false and deceptive when he made it.

340.   At the time of making the misrepresentation Defendant intended to deceive Mr. Burgueno.

**Mariza Borboa**

341.   On May 1, 2012, Consumer Mariza Borboa entered an agreement with a company associated with Defendant, Ilya Kuriaki, LLC, for the purchase of 3327 W. Campbell Ave., Phoenix Arizona 85017, for a purchase price of $59,999 with a down payment of $10,000, and a monthly payment of $500.

342.   At the time of entering the purchase agreement, Defendant explained the agreement to Ms. Borboa and orally made the misrepresentations specified in ¶¶ 274 and 279.

343.   Once the lease term expired, Ms. Borboa forfeited her $10,000 down payment and two years of monthly payments she believed would be applied towards the cost of her home.

///

344.   In justifiable reliance on the oral misrepresentations, Mariza Borboa entered a purchase agreement, paid a $10,000 down payment, made monthly payments of at least $560 a month for at least twenty-four months, causing at least $23,440 in damages to Ms. Borboa.

345.   The misrepresentations were material, and Defendant knew or should have known that the misrepresentations described in ¶¶ 274 and 279 were false and deceptive at the time he made them to Ms. Borboa.

346.   Defendant made the misrepresentations and omissions described in ¶¶ 274 and 279 with the intent to deceive the Ms. Borboa.

**Maria Elena Sanchez**

347.   In October, 2014, Defendant entered an agreement with consumer Maria Elena Sanchez whereby he agreed on behalf of Michab West, LLC, to transfer title to 4807 W. Earll Dr., Phoenix, Arizona 85031 to Maria Elena Sanchez.

348.   In this agreement, Defendant misrepresented that there was a $20,000 lien placed against the property, when, in fact the lien was for $45,000.

349.   Defendant misrepresented that he would he would, within nine months of the agreement, cause the lien to be paid off and released from the property so that Ms. Sanchez would own the property free and clear of all liens and encumbrances.

350.   Defendant failed to pay off the lien within nine months as agreed.

351.   In justifiable reliance on the written misrepresentations, Maria Elena Sanchez entered an agreement with Defendant, causing at least $45,000 in damages to Ms. Elena Sanchez.

352.   The misrepresentations made by Defendant were material, and Defendant knew or should have known that the misrepresentations were false and deceptive when he made them to Maria Elena Sanchez.

353.   Defendant made the misrepresentations in ¶ 348-349 with the intent to deceive Ms. Sanchez.

///

## COUNT FIVE

**(Non-Dischargeability – 11 U.S.C. § 523(a)(7) (Disgorgement - Civil Penalties)**

354.    The State reiterates each and every allegation above as if set forth in full.

355.    Defendant, and others, acted in concert to defraud primarily Spanish speaking consumers of hundreds of thousands of dollars through misrepresentations and deceptive business practices.

356.  Diaz, and others, represented themselves as able to provide consultation services and other assistance to certain consumers interested in selling their homes through a short sale or purchasing homes with bad credit.

357.    Diaz, and others pilfered the monies of certain consumers who entrusted the funds to them, deceived certain consumers into signing leases rather than purchase instruments thereby misleading the nature of the real estate transaction and the purpose and effect of the transactions, coerced certain consumers into making higher monthly house payments than originally agreed, and caused certain consumers to lose their home to foreclosure or eviction.

358.    As a result of the foregoing, Diaz, and others, violated the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521 - 1534, by engaging in the use of deception, deceptive acts or practices, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with its advertisement or sale of services. Such acts and practices include, but are not limited to, the following:

    a.    Misrepresenting the nature and effect of real estate transactions with certain consumers;

    b.    Misrepresenting the amount of money certain consumers would be required to pay each month under their lease agreements to avoid default;

    c.    Misrepresenting the amount of money certain consumers would be charged under purchase contracts;

-42-

d. Misrepresenting the payment terms for loans entered by certain consumers;

e. Misrepresenting that consumer deposit monies would be refundable;

f. Misrepresenting that consumer deposit monies would be held in trust and only used for the purposes authorized by the consumers, and;

g. Misrepresenting that certain consumer service payments were refundable for longer than three days after the start of the agreement.

359. As a result of the foregoing, Diaz, and others, violated the Arizona Organized Crime, Fraud and Terrorism Act A.R.S. §§ 13-2301 – 2323 by engaging in acts constituting a scheme or artifice to defraud, each act being for financial gain and chargeable or indictable under the laws of this state and punishable by imprisonment for more than one year, in violation of A.R.S. § 13-2314.

360. As a result of the foregoing, Diaz, and others, violated the Arizona Organized Crime, Fraud and Terrorism Act A.R.S. §§ 13-2301 – 2323 by engaging in acts constituting money laundering, each act being for financial gain and chargeable or indictable under the laws of this state and punishable by imprisonment for more than one year, in violation of A.R.S. § 13-2314.

361. As a result of the foregoing, Diaz, and others, violated the Arizona Organized Crime, Fraud and Terrorism Act A.R.S. §§ 13-2301 – 2323 by engaging in acts constituting the illegal conduct of an enterprise by associating with an enterprise and conducting the enterprise's affairs through racketeering, or directly or indirectly participating in the conduct of an enterprise that the Defendant knew was being conducted through racketeering, in violation of A.R.S. § 13-2312 and 13-2314 *et seq.*

362. The State filed an action in Maricopa County Superior Court (the "State Action") in March of 2016, seeking that Diaz be ordered to disgorge to the State an amount equal to all profits, gains, gross receipts, and other benefit acquired by any unlawful means or practices alleged in the State Action, pursuant to A.R.S. § 44-1528.

363. Pursuant to A.R.S. § 44-1531.02(C), disgorged amounts awarded to the State in the State Action under the Arizona Consumer Fraud Act may be expended by the Arizona Attorney General to support a variety of consumer protection activity; the State is not compelled to use the disgorged funds to compensate consumers; and disgorgement is not intended to compensate the State for actual pecuniary loss.

364. The State also seeks an order requiring Diaz, and others, to pay to the State of Arizona a civil penalty of up to $10,000.00 for each willful violation of the Consumer Fraud Act pursuant to pursuant to A.R.S. § 44-1531.

365. Pursuant to A.R.S. §44-1531.01, civil penalties awarded to the State in the State Action under the Arizona Consumer Fraud Act shall be expended by the Arizona Attorney General by the attorney general for operating expenses, consumer fraud education and investigative and enforcement operations of the consumer protection division; the State is not compelled to use the civil penalties to compensate consumers; and civil penalties are not intended to compensate the State for actual pecuniary loss but are awarded for the purposes of punishment and deterrence.

366. The State also seeks an order in the State Action requiring Defendant to pay the State its costs of investigation and prosecution of the matter, including reasonable attorney fees, pursuant to A.R.S. § 44-1534 and A.R.S. § 13-2314.

367. Both disgorgement and civil penalties, if and when awarded in the State Action, constitute a fine, penalty, and/or forfeiture payable to a governmental unit and not for compensation for actual pecuniary loss, and are, therefore, nondischargeable pursuant to 11 U.S.C. § 523(a)(7), and no proceeding or determination in the above referenced Court is required to exempt disgorgement and civil penalties from discharge under 11 U.S.C. § 524.

**WHEREFORE**, the State respectfully requests that this Court enter a non-dischargeable judgment against Defendant Ruben Diaz as follows:

A. If and to the extent that restitution is ordered in the State Action under the Arizona Consumer Fraud Act, A.R.S. § 44-1521 *et seq.*, or in this

proceeding as may be appropriate, that the amount of restitution awarded to the State to remedy the business practices identified in this Complaint be decreed non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) as debts acquired through the actual fraud of Defendant, 11 U.S.C. § 523(a)(4) as debts for fraud or defalcation while Defendant was acting in a fiduciary capacity, and/or 11 U.S.C. § 523(a)(4) as debts for embezzlement together with associated attorney fees;

B. While a determination of nondischargeability is not necessary, if and to the extent that disgorgement is ordered in the State Action, or in this proceeding as may be appropriate, that the amount determined to be disgorged be decreed non-dischargeable pursuant to 11 U.S.C. § 523(a)(7);

C. While a determination of nondischargeability is not necessary, if and to the extent that civil penalties are ordered in the State Action, or in this proceeding as may be appropriate, that the amount of the civil penalties be decreed non-dischargeable pursuant to 11 U.S.C. § 523(a)(7);

D. While a determination of nondischargeability is not necessary, if and to the extent that civil penalties and/or disgorgement are ordered in the State Action, or in this proceeding as may be appropriate, pursuant to A.R.S. § 44-1534 and A.R.S. § 13-2314, that the amount of the costs of investigation and prosecution of the matter, including reasonable attorney fees, be decreed non-dischargeable pursuant to 11 U.S.C. § 523(a)(7);

///
///
///
///
///
///
///

1         E.  For such other and further relief as the Court deems just proper and just.

2

3         DATED:  January 3<u>rd</u>, 2017.

4                             STATE OF ARIZONA

5

6                             */s/ Mitchell Allee*

7                             Mitchell Allee
                              Valerie Marciano

8                             Assistant Attorneys General
                              *Attorneys for the State of Arizona*

9

10

11   The foregoing electronically filed ECF
     this 3rd day of January, 2017.

12

13   **COPY** of the foregoing sent via *e*-mail
     this 3rd day of January, 2017, to:

14

15

16   Michael G. Helms
     Helms Law Group, PLC

17   1302 W. Camelback Rd.
     Phoenix, AZ  85013

18   mghelms@mghlawfirm.com
     *Attorneys for Ruben Diaz; ProSolutions, LLC;*

19   *Rancho Grande, LLC; Desert Tri-Star, LLC;*
     *Golem, LLC; Ilya Kuriaki and Associates, LLC;*

20   *Mozart Clan, LLC; Michab West, LLC;*
     *Quinsey, LLC; and Saguaro Desert Solutions, LLC*

21

22   D.Lamar Hawkins
     Heather A. Macre

23   Aiken Schenk Hawkins & Ricciardi P.C.
     2390 East Camelback Road, Suite 400

24   Phoenix, AZ 85016-3479

25   dlh@ashrlaw.com
     ham@ashrlaw.com

26   *Attorneys for Debtor*

27

28      *s/ Sophia Descheeny*